STATE of Indiana, Appellant,

v.

Walter DYE, Appellee.

No. 49S00–0002–PD–112.

Supreme Court of Indiana.

March 6, 2003.

Steve Carter, Attorney General of Indiana, Timothy W. Beam, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Susan K. Carpenter, Public Defender of Indiana, Laura L. Volk, Deputy Public Defender, Kathleen Cleary, Deputy Public Defender, Barbara S. Blackman, Special Assistant to the Public Defender, Indianapolis, IN, Attorneys for Appellee.

DICKSON, Justice.

Walter Dye was convicted of three counts of murder and the jury recommended the death penalty. Following a subsequent sentencing hearing, the trial court sentenced the defendant to death. We affirmed his convictions and sentence on appeal. *Dye v. State*, 717 N.E.2d 5, 22 (Ind.1999). The defendant thereafter petitioned for post-conviction relief, and the post-conviction court rejected most of his claims except that of juror misconduct. As to this latter claim the post-conviction court vacated both the defendant's death sentence and his convictions. The post-conviction court concluded that a juror's omissions and false responses on her jury questionnaires and during voir dire amounted to gross misconduct that probably harmed the defendant, denying him a fair trial. The State appeals this determination, and Dye cross-appeals the post-conviction court's rejection of his other claims. We affirm the post-conviction court.

Either the State or the defendant may appeal a post-conviction decision, and in either case our standard of review is governed by Indiana Trial Rule 52(A):

On appeal of claims tried by the court without a jury or with an advisory jury,

at law or in equity, the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

The State's appeal is determined using the "clearly erroneous" standard. It is a review for sufficiency of the evidence, and we neither reweigh the evidence nor determine the credibility of witnesses but consider only the probative evidence and reasonable inferences supporting the judgment. *Moore v. State,* 771 N.E.2d 46, 50 (Ind.2002). We reverse only on a showing of "clear error"—that which leaves us with a definite and firm conviction that a mistake has been made. *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995). In reviewing the State's claim that the post-conviction court erroneously granted relief to the defendant, "the inquiry is essentially whether there is *any* way the trial court could have reached its decision." *Id.* at 1120 (emphasis in original).

The State contends that the post-conviction court clearly erred in concluding that a new trial was required by its findings that Jackie Gunn, a juror during both the guilt phase and penalty phase of the defendant's trial, concealed her and her family's criminal histories, her history as a victim of a crime, and her disposition to impose the death penalty. The State argues that the inaccuracies in Gunn's questionnaire answers were unintentional, her victimization was dissimilar and remote, and that she repeatedly affirmed that she could be a fair juror and would decide the case on the evidence presented.

The prospective jurors were sent two questionnaires in advance of trial, which Gunn received and completed. In one, the prospective jurors were requested to answer various questions including the following:

25. Have you or anyone in your immediate family ever appeared as a witness in any court case, before a grand jury, or any type of proceeding?

26. Have you or any family member ever been a *witness* to a crime?

27. Have you or any family member ever been a *victim* of a crime?

28. Have you or any family member ever been charged with a crime?

41. Do you feel the death penalty should be mandatory for any particular type of crime?

44. If you believed that a person was guilty of the intentional murder of another person, would you *automatically* [:] vote for the death penalty; vote against the death penalty; don't know

Petitioner's Exhibit 11(A) (Gunn Questionnaire). In another questionnaire, the prospective jurors were asked:

10. Have you or any member of your immediate family ever appeared in court for any reason (other than traffic)

11. Have you or any member of your immediate family ever been a victim of a crime?

*Id.*

In answering the questionnaires, Jackie Gunn answered each of the above questions negatively, indicating that neither she nor any members of her family had ever appeared as a witness or been in court for any other reason, or been the victim of, witness to, or charged with a crime. She also stated in her juror questionnaire that she did not feel the death penalty should be mandatory for any type of crime, but would vote automatically for the death penalty if a person were found guilty of intentional murder.

During voir dire, the trial court asked the prospective jurors if they believed everyone who commits murder should be

given the death penalty, and Gunn did not respond. Trial Record at 863–65. Also during voir dire, defense counsel asked: "Anybody have any contact with the prison system as a worker, or even somebody in your family that's been in prison? And I don't mean the county jail, I mean the Department of Corrections?" *Id.* at 1639. Mrs. Gunn responded, "I had a brother in prison, and he's deceased now." *Id.* When asked, she said that she had never visited her brother, who had been incarcerated in California. *Id.* She was not asked nor did she volunteer any further details. Gunn was seated on the jury.

At the post-conviction review hearing, however, Gunn testified that her brother had been convicted of two homicides in California, was sentenced to death, and died while incarcerated. P.C.R. Tr. at 17–18. Members of her family testified on his behalf during the penalty phase of his capital case. Gunn testified that she believed her brother deserved the death penalty because a person should receive the death penalty for killing someone. *Id.* at 18. In her testimony, she explained that she did not mention her brother or his death sentence in her questionnaire because "at the time I didn't think it was anybody's business." *Id.* at 22. Two of Gunn's siblings had been arrested, but she did not mention that in her questionnaire because, "I didn't think about none of them." *Id.* She did not disclose her own conviction for operating while intoxicated because she "didn't even think about it." *Id.* When she was two or three years old she was raped by an uncle, a fact that she revealed in her post-conviction testimony but did not disclose on her questionnaire because she "tried to forget it." *Id.* Her uncle was never charged for the offense. Gunn admitted in her post-conviction testimony that she thought about the rape during the defendant's trial. *Id.* at 20.

The State argues that because the defendant failed to establish that Gunn intentionally withheld the information regarding her and her family's criminal histories, her omissions do not amount to gross misconduct and probable harm. Furthermore, the State urges that Gunn's failure to disclose that she had been raped as a young child was not gross misconduct because Gunn also stated that she would be able to be an impartial juror and appropriately evaluate the evidence, and because any bias Gunn might have had because of being raped "is too remote and attenuated to sustain a reasonable degree of probability that she was biased." Br. of Appellant at 10. The State also claims that Gunn's failure to respond to the court's questions in voir dire regarding the automatic imposition of the death penalty does not amount to gross misconduct because the defendant waived consideration of the issue by failing to challenge Gunn for cause based on her inconsistent responses. The State also asserts that there is no evidence that at the time of the defendant's trial she was an "automatic death penalty juror." *Id.* Finally, the State argues that there is a considerable societal interest in the finality of criminal proceedings, and that the integrity of the jury system requires us to reverse the post-conviction court's judgment. *Id.*

The United States Supreme Court articulated a particularized test for determining whether a new trial is required due to juror deceit during voir dire or on jury questionnaires in *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). The two-part test states that in order to obtain a new trial, the defendant "must first demonstrate that a juror failed to answer honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556, 104 S.Ct. at 850, 78

L.Ed.2d at 671. The juror's incorrect response in *McDonough* was an honest mistake, but the test applies equally to deliberate concealment and to innocent nondisclosure. *See, e.g., Zerka v. Green,* 49 F.3d 1181, 1185 (6th Cir.1995); *United States v. Langford,* 990 F.2d 65, 68 (2d Cir.1993); *Artis v. Hitachi Zosen Clearing, Inc.,* 967 F.2d 1132, 1141–42 (7th Cir. 1992). *McDonough* was a civil case, but it has been applied on federal habeas review. *See Fitzgerald v. Greene,* 150 F.3d 357, 362–63 (4th Cir.1998).

In *Warner v. State,* 773 N.E.2d 239 (Ind. 2002), we confronted a claim that juror misconduct in a criminal case warranted a new trial and noted:

> Generally, proof that a juror was biased against the defendant or lied during voir dire entitles a defendant to a new trial. A defendant seeking a new trial because of juror misconduct must show gross misconduct that probably harmed the defendant. We review the trial judge's determination on these points for abuse of discretion.

*Id.* at 246 (included citations omitted); *see also Allen v. State,* 749 N.E.2d 1158, 1164 (Ind.2001) ("juror misconduct will warrant a new trial only when the misconduct is both 'gross' and 'harmed the defendant' "). The trial court in *Warner* concluded that the juror did not deliberately withhold information, that she was not biased, and that the defendant received a fair trial. On appeal, we found no abuse of discretion, declined to find gross misconduct, and concluded that there was "very little likelihood that the juror's omitted response in

any way affected the verdict." *Warner,* 773 N.E.2d at 247.

In contrast, the post-conviction court here concluded that juror Gunn made omissions and false statements on her jury questionnaires and during voir dire, that those responses amounted to gross misconduct, and probably harmed the defendant by denying him a fair trial. These determinations present mixed issues of fact and law. We do not defer to the post-conviction court's determinations of law, but we do accept its factual findings unless they are "clearly erroneous." *Conner v. State,* 711 N.E.2d 1238, 1245 (Ind.1999).

### *Personal and Familial Criminal Histories*

■ The State argues that the post-conviction court erroneously found Gunn's misstatements regarding her personal criminal history and her siblings' criminal histories to be gross misconduct that probably harmed the defendant. As to the concealment of Gunn's brother's California murder convictions and death sentence, the State argues that any misconduct in failing to include the information in the questionnaire was cured when she mentioned him in voir dire [1] because defense counsel then had the opportunity to question Gunn about her brother. The post-conviction court characterized Gunn's voir dire disclosure of her brother's incarceration as "less than candid." Appellant's App. at 811.

During his testimony in the post-conviction proceedings, the defendant's trial counsel was asked, "[h]ad you known that her brother had been convicted of two

---

1. When defense counsel asked the potential jurors in voir dire whether any of them had ever had "any contact with the prison system as a worker, or even somebody in your family that's been in prison?" Gunn indicated that she had. Trial Record at 1639–40. When her turn came, the following exchange occurred:

> Gunn: I had a brother in prison, and he's deceased now.
> Attorney: Here in Indiana?
> Gunn: No, California.
> Attorney: Did you ever go visit him?
> Gunn: No.
> *Id.* at 1640.

sexual homicides and received a death sentence which she believed that he deserved, would you have challenged her for cause?" He responded, "[y]es and I certainly would have struck her peremptorily." P.C.R. Tr. at 646. Later, when asked whether he would have challenged Gunn . for cause based on her family's involvement with the justice system, counsel answered:

> That's a tough question to answer. Normally if a juror has a family with a criminal history, normally the impression would be she would favor the defense. Most people whose family members have been prosecuted feel that their family members did not get fair treatment from the State. I would want to question her further about what feelings she had about the entire justice process caused by her family's involvement in these cases and her own personal involvement.

P.C.R. Tr. at 647.

The State argues that Gunn's questionnaire responses relating to her conviction for driving while intoxicated and her siblings' arrests do not amount to gross misconduct. As to Gunn's questionnaire response deliberately concealing that her brother had been convicted and sentenced to death in California, the State argues that she corrected the omission during jury selection by stating that she had a brother in prison in California. It is correct that Gunn truthfully answered what she was asked on voir dire. Although she did not volunteer her brother's death sentence, the questions asked of her did not seek this information. Jurors cannot be expected to answer questions they are not asked, no matter how relevant the answers may be to the lawyers and the trial court. While Gunn's voir dire answers may have been literally truthful, however, this does not excuse the fact that her brother's prior convictions and death sentence were inten-

tionally obscured by her deliberate dishonesty in responding to the questionnaire regarding family criminal charges. The post-conviction court did not err in finding this to be gross misconduct.

### Gunn's Experience as a Victim of Rape

■ In her questionnaire, Gunn twice answered "no" to the question of whether she or any member of her family had ever been a victim of a crime. Petitioner's Exhibit 11(A) (Gunn Questionnaire). However, in the post-conviction hearing, she testified that she had been raped by her uncle when she was two or three years old, but that her uncle had not been prosecuted. P.C.R. Tr. at 20. She also testified that she still thinks about the rape, and, although she did not reveal the crime on her juror questionnaire because she has "tried to forget it," she thought about her experience during the trial. *Id.* at 20–22. A different juror in this case was struck for cause when she indicated that she could not be a fair juror because of a childhood experience. She did not reveal what that experience was, but the trial court removed that juror from the panel. Trial Record at 967, 1007.

Judge Gifford, who presided over both the original trial and the post-conviction proceeding, noted that the other juror's removal indicated that, had Gunn revealed that she had been raped, either the State or the defense might have determined that her experiences would impact her verdict or recommendation. Appellant's App. at 9. The defendant's trial counsel testified at the post-conviction hearing that, had a juror provided information that she had been raped by a relative, he would have:

> Questioned her on it and asked her if she could sit on this case where there were allegations of a sexual assault, at least circumstantially, against [the victim] and asked her if she really felt she

could be fair in this case because of her prior victimization in a sexual assault case and almost certainly stricken her peremptorily if not for cause.

P.C.R. Tr. at 647.

The State raises *Williams v. State*, 275 Ind. 434, 417 N.E.2d 328 (1981) in support of its argument that Gunn's rape was too remote and attenuated from the crimes charged and evidence presented at trial to establish that Gunn might be biased. In *Williams*, we affirmed the decision of the trial court to reject the defense's motion to strike a juror for cause where the juror had been a victim of a burglary or a robbery, and the defendant was on trial for burglary and robbery. In the present case, while the defendant's convictions did not include rape, evidence was presented at his trial that one of the victims was found laying partially undressed in a position highly suggestive of sexual assault, and a semen-stained washcloth was found near her body. Noting that the State did not charge that the victim was murdered in the course of a sexual assault, the post-conviction court nevertheless found that "a reasonable inference of sexual activity could be drawn from the evidence." Appellant's App. at 811. The court also found that Gunn's failure to disclose that she had been a victim of a crime "deprived the state and the Defendant of the opportunity to determine upon voir dire whether these experiences would have impacted upon her verdict or recommendation." *Id.*

The post-conviction court's findings on this issue are not clearly erroneous.

### Gunn's Views on the Death Penalty

 The State contends that the post-conviction court erroneously found that Gunn would automatically vote for death for an intentional murder and thus "was neither competent nor qualified to serve on this capital jury." Appellant's App. at 810. The State argues that there is no evidence that Gunn was an "automatic death penalty" juror.[2]

In her pre-trial questionnaires, Gunn disclosed that if she "believed that a person was guilty of the intentional murder of another person," she would automatically vote for the death penalty. Petitioner's Exhibit 11(A) (emphasis in original). In response to another question, however, she indicated her belief that the death penalty should not be "mandatory for any particular type of crime." *Id.* Thereafter, during voir dire, the trial judge asked whether any of the prospective jurors believed that everyone who commits murder should get the death penalty. Trial Record at 863–64. Several jurors indicated that they did, but Gunn was not among them. *Id.* at 864–65. Gunn was not questioned during voir dire regarding her views of the death penalty. At the post-conviction hearing, Gunn testified that she believed her brother, after being convicted of killing two women in California, deserved the death penalty because, "I believe if you kill

**2.** We considered an issue very similar to this in the defendant's direct appeal. *Dye v. State*, 717 N.E.2d 5 (Ind.1999). In his direct appeal, the defendant argued that the trial court erred when it failed to excuse two prospective jurors for cause who, at one point, expressed the view that they would automatically vote to impose the death penalty in the case of a knowing or intentional murder, but reconsidered their opinions upon further questioning. We held that the Fourteenth Amendment had

not been violated because the trial judge inquired about the possibility that those jurors would vote automatically to impose the death penalty, and defense counsel was afforded the same opportunity to inquire. *Id.* at 18. Questioning revealed that those jurors both understood that their absolute views were contrary to law, and agreed to follow the law and their oath. *Id.* The trial court did not excuse them for cause, but both were later excused through the use of peremptory challenges.

somebody, you should get the death penalty." P.C.R. Tr. at 18.

█ Had Gunn's opinion been disclosed during voir dire, the defense would have been entitled to remove her for cause. The requirement of jury impartiality embodied in the Due Process Clause of the Fourteenth Amendment permits a capital defendant to challenge for cause any prospective juror who would vote to impose death automatically upon a finding of guilt. *Morgan v. Illinois,* 504 U.S. 719, 727, 112 S.Ct. 2222, 2229–30, 119 L.Ed.2d 492, 501–02 (1992). "If even one [partial] juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.* at 729, 112 S.Ct. at 2230, 119 L.Ed.2d at 503. The post-conviction court found that a challenge to the juror in the present case would have been sustained.

We are troubled, however, by the fact that the defendant's trial counsel failed to question Gunn on voir dire notwithstanding her pre-trial questionnaire answer that she would automatically vote for the death penalty for a defendant found guilty of an intentional murder. Such inquiry would likely have elicited Gunn's death penalty predisposition and permitted her timely excusal. Among the defendant's post-conviction claims, he asserted ineffective assistance of trial counsel in part for failing to adequately question and challenge juror Gunn for cause. The post-conviction court did not address this claim, finding that "[w]hile it is clear that the court would have sustained a challenge for cause of this juror, the misconduct of the juror supercedes any alleged deficient performance by trial counsel." Appellant's App. at 836. To the extent that defense counsel failed to assert a challenge for cause, under the circumstances presented, this omission constituted substandard performance with resulting prejudice. We conclude that, re-gardless whether analyzed as juror misconduct or as ineffective assistance of counsel, the result is the same.

### Evaluation and Conclusion

█ In deciding to reverse the defendant's sentence and convictions, the post-conviction court cumulatively addressed the individual claims of juror misconduct:

> The combination of these omissions and false statements cannot be ignored. Having found that gross juror misconduct has been established in this cause, the court further finds that the misconduct by Ms. Gunn probably harmed the defendant. Jackie Gunn's strong views concerning the death penalty, combined with her own alleged sexual abuse, resulted in a verdict and sentencing recommendation that probably harmed the defendant by denying him a fair trial. Mr. Dye's convictions and sentence must be reversed due to gross juror misconduct.

Appellant's App. at 811.

In our review of the State's claim that the post-conviction court's findings are clearly erroneous, we are cognizant that Judge Gifford, who presided in both the original trial and the post-conviction hearing, was in an exceptional position to assess not only the weight and credibility of the factual evidence, but also the probable impact of the alleged juror misconduct, including whether it deprived the defendant of a fair trial. Because the court's findings are mixed questions of law and fact, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *State v. Holmes,* 728 N.E.2d 164, 168–69 (Ind.2000); *Spranger,* 650 N.E.2d at 1119. Upon this review, we do not find clear error.

The State also argues that the post-conviction court's decision "will open the floodgates to numerous juror investigations after sound verdicts have been rendered" and warns that the corollary response of the State will be "to conduct extensive pre-trial investigations of the venire to protect convictions and sentences." Br. of Appellant at 10. We agree that these consequences are extremely undesirable. This is so not only because of the societal interest in the finality of criminal proceedings but also because of our interest in assuring the safety and personal privacy of citizens who serve as jurors. Post-trial investigations of jurors should be the exception, not the rule. In the absence of manifest indications of material discrepancies appearing in the record, jurors should not be subjected to post-conviction investigation on the mere possibility that one or more of their questionnaire or voir dire responses may have been inaccurate. In the present case, however, the probability of Gunn's misconduct was apparent from inconsistencies between her voir dire answers and her questionnaire responses. These facial variances justified further investigation. We cannot permit our interests in finality and privacy to totally foreclose the presentation of such resulting evidence to demonstrate that gross juror misconduct undermined the defendant's right to a fair trial.

On cross-appeal, the defendant asserts error by the post-conviction court regarding: (1) whether the State suppressed material evidence, (2) whether the death-penalty information was defective, (3) whether Dye received ineffective assistance of trial counsel, (4) whether he received ineffective assistance of appellate counsel, and (5) whether the State interfered with trial counsel's representation. Br. of Appellee at 11. Because we are affirming the post-conviction court's judgment reversing the defendant's sentence and convictions on grounds of juror misconduct, these issues are moot.

We affirm the judgment of the post-conviction court.

SHEPARD, C.J., and SULLIVAN, BOEHM, and RUCKER, JJ., concur.